UNITED STATES of America

v.

**Richard P. CONSOLE, Appellant.**

**UNITED STATES of America**

v.

**Morton MARKOFF, D.O., Appellant.**

**UNITED STATES of America**

v.

**Edward C. CURCIO, Appellant.**

**Nos. 92–5507, 92–5511 and 92–5555.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 12, 1993.

Decided Dec. 22, 1993.

Nathan Z. Dershowitz and Amy Adelson, Alan M. Dershowitz (argued), Dershowitz & Eiger, P.C., Cambridge, MA, for appellant Richard P. Console.

Benjamin Goldstein (argued), Maressa, Goldstein, Birsner, Patterson, Drinkwater & Oddo, P.C., Berlin, NJ, for appellant Morton Markoff, D.O.

Dennis A. Durkin (argued), Suzanne Harris, Durkin & Durkin, Newark, NJ, for appellant Edward C. Curcio.

Edna Ball Axelrod (argued), Chief, Appeals Div., Michael Chertoff, U.S. Atty., Newark, NJ, for appellee.

Before: GREENBERG, COWEN, and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. FACTUAL AND PROCEDURAL HISTORY

#### A. FACTUAL HISTORY

Richard P. Console, Edward C. Curcio, and Morton Markoff appeal from judgments of conviction and sentences entered in the district court on September 28, 1992. We have jurisdiction under 28 U.S.C. § 1291.

The background of the case is as follows. Console and Curcio were partners in a law firm (the "firm") located in Berlin, New Jersey, and Markoff was an osteopathic physician who practiced in nearby Clementon, New Jersey. Console started the firm in 1973, and soon began hiring other associates, some of whom later became partners. Curcio joined the firm in 1978 and became a partner in 1982. Philip LiVolsi was another partner.

The firm developed a relationship with Markoff in the 1970's, which continued into the 1980's. Markoff referred accident victims to the firm for legal services, and the firm referred clients to Markoff for medical services. When treating a client of the firm, Markoff sent the client's medical bills to the firm, which in turn sent them to the client's insurance company for the payment of the client's personal injury protection ("PIP") benefits pursuant to New Jersey's No–Fault

law governing claims for injuries from automobile accidents.[1] When making a claim on behalf of a client seeking "special damages," the firm also sent the medical bills either to the client's or the defendant's insurance company to support claims for pain and suffering or other "special damages" sustained by the client. Markoff received the PIP payments corresponding to the medical bills he sent to the firm, and the firm retained a share of any recovery made for a claim.

#### B. PROCEDURAL HISTORY

In 1985, federal agents searched the firm, and in April 1989, a grand jury indicted Curcio and Markoff along with four codefendants: LiVolsi, the firm's legal administrator (Peter Hulmes), and two of Markoff's employees (Virginia Knowlton and Carmella Lombardi).[2] The indictment charged the defendants with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, and the federal mail fraud statute, 18 U.S.C. §§ 1341–42, perpetrated in connection with a scheme to defraud insurance companies by submitting inflated medical bills on behalf of accident victims represented by the firm.

On April 24, 1990, LiVolsi agreed to plead guilty to one count of RICO and two predicate acts of mail fraud and to testify before a new grand jury. This grand jury returned a superseding indictment on August 23, 1990, charging two additional defendants, Console and Kathy Baldwin–Sabath, an employee of the firm, with the commission of offenses. Subsequently there were two jury trials in the United States District Court in this case.

Count 1 of the final superseding indictment charged the appellants and the codefendants with conducting and participating in the conduct of an enterprise consisting of the firm and Markoff's medical practice (the "Law Firm–Markoff Enterprise") through a pattern of racketeering activity involving multi-

---

1. In New Jersey, an automobile accident victim obtains PIP benefits which include medical bills, lost wages and certain "essential services" from his own insurance company. Accident victims also can institute third-party suits if their medical bills exceed a threshold amount and may make claims against their own insurance companies if the other drivers are underinsured or uninsured.

2. There have been prior proceedings in this court arising from these prosecutions. *See In re Impounded Case (Law Firm)*, 879 F.2d 1211 (3d Cir.1989); *In re Impounded Case (Law Firm)*, 840 F.2d 196 (3d Cir.1988).

ple acts of mail fraud. 18 U.S.C. §§ 1962(c) and 2. Similarly, Count 2 charged the appellants and the codefendants with conspiring to conduct the affairs of the Law Firm–Markoff Enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d). The indictment also charged each of the appellants with multiple counts of mail fraud. 18 U.S.C. §§ 1341 and 2.

Prior to the first trial, the appellants moved to dismiss the indictment by reason of alleged prosecutorial misconduct. The district court heard argument on the motions and decided to review all grand jury transcripts *in camera.* But the government provided 14 of the more than 100 transcripts it produced without colloquy. The government informed the district court that these 14 transcripts had been irreparably water damaged and lost while in the court reporter's possession. In response to motions regarding this incident, the district court held hearings in December 1989 and January 1990. In an opinion filed on April 11, 1990, the district court held that any prosecutorial misconduct before the grand jury was harmless.

The first trial began on February 26, 1991. During this trial, Knowlton agreed to plead guilty to one count of mail fraud. The jury returned its verdict in June 1991. Markoff was convicted of the RICO counts and 24 counts of mail fraud but he was acquitted of 11 mail fraud counts. Console and Curcio also were acquitted of certain mail fraud counts. The jury, however, did not reach a verdict on the RICO counts and certain mail fraud counts against Console, Curcio, and Hulmes, and consequently the court declared a mistrial as to these counts. The jury acquitted Sabath and Lombardi on all counts.

Following his conviction, Markoff learned that during jury deliberations a juror had obtained information regarding the case from her sister-in-law who was an attorney and had shared that information with other jurors. In September 1991, the district court held hearings to determine the nature of this communication, whether it was prejudicial, and whether Markoff's convictions should be

set aside. During *in camera* proceedings, the district court questioned each juror individually. Based on the jurors' *in camera* testimony, the district court determined that one of the jurors made a remark during deliberations indicating that she had discussed the case with her sister-in-law who was an attorney. Nonetheless, the court held that the juror's comment had not prejudiced Markoff, and thus it denied his motion to set aside his convictions. Although the juror who mentioned her sister-in-law's comments during deliberations testified *in camera* that other jurors had read newspapers during the trial, the court also denied Markoff's request for a second jury inquiry to investigate these allegations.

Following his convictions, Markoff entered into a cooperation agreement with the government and agreed to testify against Console, Curcio, and Hulmes at a second trial. Console moved to dismiss the charges against him on double jeopardy grounds prior to the second trial, but the district court denied his motion. The district court also denied Curcio's severance motion. The second trial began on February 25, 1992, and the jury returned its verdict on May 21, 1992, convicting Console and Curcio on both RICO counts. The jury also convicted Console and Curcio of eight counts of mail fraud and four counts of mail fraud, respectively. The jury, however, acquitted Hulmes of all charges except for one which the court then dismissed.

■ The court sentenced the three appellants to lengthy prison terms on September 25, 1992, and required Console and Markoff to pay restitution to the victims of their RICO and mail fraud violations. The judgments of conviction were entered on the docket on September 28, 1992, and the appellants timely appealed.[3]

## II. DISCUSSION

### A. FAILURE TO ESTABLISH A RICO ENTERPRISE

The appellants argue that the evidence was insufficient to support their convictions

---

3. Console appealed on the day of the sentencing but before the judgment was entered. We nevertheless have jurisdiction. Fed.R.App.P. 4(b);

*United States v. Hashagen,* 816 F.2d 899 (3d Cir.1987) (in banc).

for violations of 18 U.S.C. § 1962(c) and (d), because the government failed to establish the existence of a RICO "enterprise." [4] Section 1962(c) prohibits "any person employed by or associated with any enterprise" affecting interstate or foreign commerce from conducting or participating "in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d) makes it unlawful to conspire to violate Section 1962(c) or the other substantive provisions of RICO.

■ RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), the Supreme Court stated that an enterprise "is an entity separate and apart from the pattern of activity in which it engages," and that it is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." In *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), "we construed *Turkette* to require proof of each of the three sub-elements referred to by the Court in this passage": (1) proof of an ongoing organization, (2) proof that the associates function as a continuing unit, and (3) proof that the enterprise is an "entity separate and apart from the pattern of activity in which it engages." *United States v. Pelullo*, 964 F.2d 193, 211 (3d Cir.1992) (citing *Riccobene*, 709 F.2d at 221–24). Thus, although the proof used to establish the existence of an enterprise and a pattern of racketeering "may in particular cases coalesce," proof of a pattern of racketeering activity "does not necessarily" establish the existence of an enterprise. *Id.* [5]

In this case, the government alleged that the RICO enterprise was an association in fact composed of the law firm and Markoff's medical practice and designed "to enrich its members through the pursuit of personal injury business." Govt. Br. at 13. The appellants argue, however, that the evidence did not demonstrate (1) "that there was any kind of organizational structure for decision-making," (2) that the appellants associated together on more than "an ad hoc basis," or (3) that the "enterprise existed separate and apart from the racketeering activity alleged." Markoff Br. at 9, 12. Thus, according to the appellants, "[a]ll that was shown was that the medical practice and the lawyer's office combined to commit mail fraud on an ad hoc basis." *Id.* at 12.

■ The existence *vel non* of a RICO enterprise is a question of fact for the jury. *Riccobene*, 709 F.2d at 222. In this case, both the jury that convicted Markoff of RICO violations (Trial I), and the jury that convicted Console and Curcio of RICO violations (Trial II) determined that the government established the existence of the RICO enterprise beyond a reasonable doubt. We must sustain these determinations "if there is substantial evidence, taking the view most favorable to the Government, to support [them]." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir.1990) (citing *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Leon*, 739 F.2d 885, 890 (3d Cir.1984)), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). Thus, we must review the evidence introduced at trial, drawing all reasonable inferences in favor of the prosecution, to determine whether there is substantial evidence to support the existence of a RICO enterprise.

■ As we stated in *Riccobene*, 709 F.2d at 222, "[e]ach of the [three] elements enu-

---

**4.** This argument is raised in Point I of Markoff's brief and Point I of Curcio's brief. Markoff Br. at 7–15; Curcio Br. at 12–15. Console has adopted their arguments. Console Br. at 73.

**5.** Although proof of a pattern of racketeering does not "necessarily" establish the existence of

an enterprise, we have stated that "in the appropriate case, the enterprise can be inferred from proof of the pattern." *Pellulo*, 964 F.2d at 212 (citing *United States v. Perholtz*, 842 F.2d 343, 363 (D.C.Cir.1988)).

merated by the Supreme Court describes a separate aspect of the life of the enterprise." The first element requires proof of an "ongoing organization." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528.

> To satisfy this element, the government must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis.

*Riccobene,* 709 F.2d at 222. The government introduced ample evidence at both trials of the existence of an organizational structure within the Law Firm–Markoff Enterprise. The evidence indicates that Markoff and Console met in the early 1980's. Govt.App. at 309 (Trial II); 798 (Trial I). At that meeting, Markoff agreed to inflate the bills of the law firm's clients in exchange for continued patient referrals from the firm. *Id.* at 310–13 (Trial II); 791–98 (Trial I). Following this meeting, Console and Markoff supervised the execution of this agreement. *Id.* at 50–66, 313–15, 410–413, 432–92 (Trial II); 790–876 (Trial I). Under Markoff's supervision, his employees falsified patient bills and charts to meet the specifications communicated by Console, LiVolsi and various employees of the firm. Govt.App. at 31–66, 432–92 (Trial II); 730–67, 826–35, 849–60, 869–75, 877–87 (Trial I). Under Console's direction, attorneys referred clients to Markoff, specified the dates and charges that should be reflected on their bills, and coached clients to make false statements regarding the extent of their medical treatment to support fraudulent insurance claims. Govt.App. at 204–39, 432–92 (Trial II); 791–99, 817, 826–34, 849–60, 869–75, 888–98 (Trial I). Thus, at each trial the government established the existence of an ongoing organization, the first element required to prove the existence of a RICO enterprise.

■ The second element of the Supreme Court's definition of a RICO enterprise requires proof "that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. To satisfy this element, the government must demonstrate "that each person perform[ed] a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization." *Riccobene,* 709 F.2d at 223. The government also introduced sufficient evidence to satisfy this requirement at each of the trials.

The evidence indicates that between 1981 and 1985, Console, Markoff, Curcio, LiVolsi, and various employees of the firm and the Markoff practice each performed roles within the enterprise structure and through their roles advanced the scheme to defraud insurance companies through the submission of falsified records, inflated bills, and false statements by patients. Console and Markoff devised the scheme and directed its execution. Govt.App. at 38–39, 47–55, 58–65, 310–315, 432–92 (Trial II); 791–99, 817–34, 846–60, 869–75, 877–98 (Trial I). Curcio referred clients to Markoff and coached them to make false statements regarding their medical treatment. *Id.* at 204–39 (Trial II); 888–98 (Trial I). LiVolsi met with Markoff and his employee in charge of billing to communicate the dates and charges that should be reflected on patient bills. *Id.* at 39–50, 462–70 (Trial II); 826–34, 847–51 (Trial I). Other firm employees also delivered lists of patient records requiring falsification to Markoff's office, and discussed the required changes with Markoff's employees over the phone. *Id.* at 39–50, 55–57 (Trial II); 745–57, 795–97, 864–75 (Trial I). Employees of the Markoff practice then falsified the records, which subsequently would be submitted to the insurance companies. *Id.* at 35–66 (Trial II); 730–57, 877–98 (Trial I). Thus, there is substantial evidence to support the juries' determinations "that the various associates [in the Law Firm–Markoff Enterprise] function[ed] as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528.

Finally, the third element of the enterprise requirement demands proof that the enterprise is an "entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2529.

> As we understand this last requirement, it is not necessary to show that the enterprise has some function wholly unrelated

to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement. *Riccobene,* 709 F.2d at 223–24. This requirement is satisfied by the evidence that both the firm and the Markoff practice coordinated the commission of multiple predicate offenses, *see* Govt.App. at 31–66, 204–39, 432–92 (Trial II), 730–67, 791–99, 817, 826–35, 849–60, 869–75, 877–898 (Trial I), and continued to provide legitimate services during the period in which they were engaged in racketeering activities, *id.* at 67, 373–74 (Trial II), 730–67 (Trial I). Thus, the evidence introduced at each trial supports the juries' determinations that the three elements of the enterprise requirement were established.

■ The appellants, however, also argue that the government failed to allege and establish a RICO enterprise consistent with the definition contained in Section 1961(4). Specifically, they argue that under Section 1961(4), an association in fact between two legal entities, like a law firm and a medical practice, is not a RICO enterprise. Markoff Br. at 13. As noted above, Section 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). According to the appellants' construction of this section, "[a]n enterprise can be either a legal entity or an association-in-fact between non-legal entities," but not an association in fact between legal entities. Markoff Br. at 13.

As the government points out, Govt.Br. at 16, we rejected this restrictive definition of a RICO enterprise in *United States v. Aimone,* 715 F.2d 822, 828 (3d Cir.1983), *cert. denied,*

468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984). *Aimone* involved a challenge to an indictment alleging the existence of an enterprise composed of "a group of individuals and a corporation associated in fact." *Id.* Like the appellants in this case, the appellants in *Aimone* argued that an enterprise could consist of either a legal entity or an association in fact, but not both. *Id.* We held that the indictment charged "a proper statutory enterprise" because an association in fact could be composed of legal as well as non-legal entities. *Id.*[6] Moreover, "[t]he Supreme Court has stated that '[t]here is no restriction upon the associations embraced by the definition' in section 1961(4)." *Id.* (quoting *Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527). Accordingly, the association in fact between the law firm and Markoff's medical practice constitutes a RICO enterprise under Section 1961(4).

## B. EVIDENCE SUPPORTING CURCIO'S CONVICTIONS

### 1. *RICO Convictions*

■ Curcio challenges the sufficiency of the evidence supporting his substantive RICO and RICO conspiracy convictions, contending that the government "failed to connect [him] . . . to the RICO conspiracy." Curcio Br. at 21. As we noted above, we review challenges to the sufficiency of evidence to determine "whether, viewing the evidence in a light most favorable to the government, there was substantial evidence upon which a reasonable jury could have based its verdict." *United States v. Pungitore,* 910 F.2d at 1129. We reject Curcio's argument and find that there was sufficient evidence to support his convictions under 18 U.S.C. § 1962(c) and (d).

■ A conviction under 18 U.S.C. § 1962(c) requires proof of four essential elements:

---

6. *See also Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165–66 (3d Cir.1989) ("nothing precludes an association of corporations for illicit purposes from constituting an enterprise"); *United States v. Thevis,* 665 F.2d 616, 625–26 (5th Cir.) (holding that a group of individuals associated in fact with corporations constitutes

an enterprise), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Huber,* 603 F.2d 387, 393–94 (2d Cir. 1979) (holding that multiple corporations can constitute an enterprise), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.

*Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir.1989) (citing *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1352 (5th Cir.1985)). To satisfy the second element or "association" requirement of section 1962(c), the defendant " 'must be shown to have been *aware* of at least the general existence of the enterprise named in the indictment.' " *United States v. Eufrasio*, 935 F.2d 553, 577 n. 29 (3d Cir.) (quoting *United States v. Castellano*, 610 F.Supp. 1359, 1401 (S.D.N.Y.1985) (emphasis added)), *cert. denied*, —— U.S. ——, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991). Similarly, a conviction under 18 U.S.C. § 1962(d) for conspiracy to violate section 1962(c) requires proof "that the individual defendants *knowingly agreed* to participate in the 'enterprise' through a pattern of racketeering." *Riccobene*, 709 F.2d at 220–21 (emphasis added).

The evidence introduced at the second trial sufficiently established that Curcio was "aware" of the existence of the Law Firm–Markoff Enterprise, "knowingly agreed" to participate in the conduct of the enterprise through a pattern of racketeering, and participated in the conduct of the enterprise through a pattern of racketeering activity. Curcio testified that he was "a trial attorney functioning as a partner" in the law firm between 1982 and 1991, Curcio App. at 15, and that prior to 1982 the firm employed him as an associate, *id.* at 13. Although he denied knowledge of any conspiracy between the firm and the Markoff medical practice, he acknowledged that he and his children had been treated by Markoff, and that during his tenure at the firm, Markoff was the treating physician for approximately 600 of the firm's cases, ten percent of the firm's total caseload. Govt.App. at 556–558.

Moreover, four of Curcio's clients who had been involved in auto accidents testified that the firm referred them to Markoff. *Id.* at 165 (William George), 205 (David Gousha), 257 (Joyce Joiner), 280–83, 291–92 (Janice Wolfe). These clients also testified that prior to arbitration proceedings regarding their insurance claims, Curcio advised them to lie about the nature of their injuries and the extent of their medical treatment. *Id.* at 171–183 (William George), 210–12 (David Gousha), 252–70 (Joyce Joiner), 291–301 (Janice Wolfe). Furthermore, Curcio's secretary testified that on one occasion, Curcio asked her to contact Markoff's office and have them "increase a bill on a client's case." *Id.* at 110. When the secretary relayed the request to Markoff's employee, Marie Maugeri, Maugeri said " '[a]ll right,' and hung up." *Id.* at 111.[7]

Curcio argues that the evidence is insufficient to connect him to the RICO enterprise because the law firm's activity was not "entirely unlawful," "none of the conduct attributed to Curcio is intrinsically unlawful," the circumstantial evidence of Curcio's membership in the conspiracy did not exclude other equally plausible inferences, and the testimony regarding Curcio's knowledge of and participation in the RICO enterprise was not credible. Curcio Br. at 22–27. We reject this argument. First of all, the activity of a RICO enterprise need not be entirely illegal. In fact, as the Supreme Court recognized in *Turkette*, "RICO's primary purpose is to 'address the infiltration of legitimate business by organized crime.' " *Riccobene*, 709 F.2d at 221 (quoting *Turkette*, 452 U.S. at 591, 101 S.Ct. at 2532). We have recognized that

'[t]he mere fact that a defendant works for a legitimate enterprise and commits racketeering acts on the business premises does not establish that the affairs of the enterprise have been conducted "through" a pattern of racketeering activity.' *United States v. Cauble*, 706 F.2d 1322, 1332 (5th Cir.1983). Instead, the government must show that a person 'is enabled to commit the predicate offenses solely by virtue of

---

7. The government also introduced documentary evidence that indicated that Curcio submitted fraudulent bills obtained from Markoff to support insurance claims.

his position in the enterprise or involvement in or control over the affairs of the enterprise; or ... the predicate offenses are related to the activities of that enterprise.' *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (quoting *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)).

*United States v. Jannotti*, 729 F.2d 213, 226 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). Curcio was able to commit the predicate acts of mail fraud only "by virtue of his position in the enterprise," and the predicate acts were intimately "related" to the firm's personal injury practice and Markoff's medical practice. Thus, although the law firm's activity was not entirely illegal, the evidence regarding Curcio's association with the firm supports an inference that he was aware of the Law Firm–Markoff Enterprise, knowingly agreed to participate in its conduct through a pattern of racketeering activity, and participated in its conduct through a pattern of racketeering activity.

Second, a substantial portion of Curcio's activities were "intrinsically unlawful." These "intrinsically unlawful" activities included the activities charged in four counts of mail fraud for which he was convicted and four instances of subordination of perjury. Third, the circumstantial evidence sufficiently supported the jury's determination that Curcio knowingly agreed to participate in the Law Firm–Markoff Enterprise through a pattern of racketeering.

> Proof of agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases. It is well-established that one conspirator need not know the identities of all his co-conspirators, nor be aware of all the details of the conspiracy in order to be found to have participated in it.

*Riccobene*, 709 F.2d at 225 (citations omitted). *See also United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir.) (citing *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct.

248, 275, 92 L.Ed. 154 (1947)), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). We find that a reasonable jury could have credited the testimony regarding Curcio's association with the Law Firm–Markoff Enterprise, and that this testimony was sufficient to indicate that Curcio was aware of the enterprise, knowingly agreed to participate in it, and knowingly participated in its conduct through a pattern of racketeering activity.

### 2. *Mail Fraud Convictions*

Curcio also challenges the sufficiency of the evidence supporting his conviction for mail fraud in conjunction with the personal injury claims of William George and David Gousha. George and Gousha were two of Curcio's clients who testified that Curcio showed them fraudulent documentation vastly overstating the medical treatment they had received from Markoff and told them to corroborate these documents by making false statements at an upcoming arbitration proceeding regarding their insurance claims. Govt.App. at 171–83 (William George), 210–12 (David Gousha). Curcio argues that Gousha "recanted" his testimony regarding Curcio's conduct and that the evidence against Curcio was "in equipoise." Curcio Br. at 23 n. 6. Gousha testified that during the arbitration proceeding Curcio acknowledged inconsistencies between Gousha's testimony regarding his medical treatment and two different versions of Gousha's medical bills. Curcio App. at 54. This testimony, however, is not incompatible with Gousha's earlier testimony that Curcio showed him a fraudulent bill and counseled him to make false statements to corroborate it. Moreover, Gousha's testimony was consistent with George's. Finally, even if the evidence were in equipoise, we would not be required to reverse unless the evidence proved insufficient for a reasonable jury to find the defendant guilty. *Pungitore*, 910 F.2d at 1129. In this case, the evidence more than sufficiently supported Curcio's conviction for mail fraud.

### C. DENIAL OF CURCIO'S MOTION FOR SEVERANCE

Curcio argues that the district court abused its discretion by denying his motion

for severance prior to the second trial because the jury could not "'reasonably be expected to compartmentalize the evidence as it relate[d] to separate defendants in view of its volume and limited admissibility.'" *United States v. Sandini,* 888 F.2d 300, 307 (3d Cir.1989) (quoting *United States v. De Larosa,* 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972)), *cert. denied,* 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990). Specifically, Curcio argues that he was prejudiced because: (1) the government's case did "not include substantial independent evidence of his guilt," and (2) the government introduced testimony against Console on mail fraud counts for which Curcio already had been acquitted at the first trial. Curcio Br. at 29.

 Motions to sever are governed by Fed.R.Crim.P. 14, which permits the trial court to grant a defendant's motion for severance if it appears that the defendant will be prejudiced by a joint trial with other defendants.

It is important to recognize that there are two separate determinations to be made when a defendant on appeal urges that he is entitled to a reversal because the district court denied a pretrial severance motion. Since the district court acted on the basis of the record before it at the time of the motion, we must first determine from that record whether the court abused its discretion in denying the severance. Then, if there was an abuse of discretion, we must consider whether the defendant was prejudiced by the order denying severance.

*Sandini,* 888 F.2d at 305.

 In determining whether the district court abused its discretion by denying Curcio's motion for severance, "we keep in

mind that a trial court should balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants; ... [and that] [t]he public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." *Eufrasio,* 935 F.2d at 568.[8] *See Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). In this case, as in *Eufrasio,* the public interest in a joint trial substantially outweighed the possibility of prejudice to the defendant. *Id.* at 569. The indictment charged both Curcio and Console with RICO violations related to the Law Firm–Markoff Enterprise, and, as we have discussed, there was substantial independent evidence of Curcio's guilt. *See Sandini,* 888 F.2d at 307.[9] Thus, we find no basis in the record to indicate that the district court abused its discretion in denying Curcio's motion for severance.

 Moreover, even if the district court abused its discretion by denying Curcio's motion, to obtain a reversal, Curcio "must demonstrate '*clear and substantial prejudice* resulting in a *manifestly unfair trial.*'" *Sandini,* 888 F.2d at 307 (quoting *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981) (emphasis in *Sandini*). Curcio has not met this heavy burden, as "[p]rejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant" or some evidence adduced is "more damaging to one defendant than others." *Eufrasio,* 935 F.2d at 568 (citing *Sandini,* 888 F.2d at 307; *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988)).[10] Furthermore, the limiting instruc-

**8.** *See also United States v. Inigo,* 925 F.2d 641, 656 (3d Cir.1991) ("It is ... customary to try persons charged as co-conspirators together, and severance of a co-conspirator's trial is required only for compelling reasons.").

**9.** *See also United States v. De Peri,* 778 F.2d 963, 984 (3d Cir.1985) ("good reasons support the general rule that persons charged with conspiracy should be tried together.... Chief among these is the conservation of public resources that would be lost if the same evidence were present-

ed at separate trials and the decreased possibility of prejudice where the evidence against each defendant is strong.") (citations omitted), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986).

**10.** *See also United States v. Adams,* 759 F.2d at 1112 ("'[a] defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than that against him.'") (quoting *United States v. Dansker,* 537 F.2d 40,

tions given by the district court prior to the introduction of evidence that the jury could not consider against Curcio helped to "compartmentalize" the evidence and thus diminished any potential prejudice to Curcio. *See, e.g.,* Console App. at 255–62, 277, 281.

## D. ADMISSIBILITY OF THE ACCIDENT BOOK

The "Accident Book" is a spiral notebook which was kept by employees of Markoff's practice. Console App. at 76–221. One of the columns on each page listed the date of an accident patient's first visit to Markoff's office. *Id.* The government used the Accident Book, *id.,* and a chart summarizing relevant entries in the book, *id.* at 222–31, to establish that patient bills predating the date recorded in the Accident Book as the patient's first visit were fraudulent.

■■■■ Rule 801 of the Federal Rules of Evidence defines hearsay as a "statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801 prohibits the admission of an out-of-court statement offered to prove the truth of the matter asserted because

> the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined.

*Pelullo,* 964 F.2d 193, 203 (3d Cir.1992). The Accident Book is hearsay because the entries are written out-of-court statements offered to prove the date when accident patients first visited the Markoff office.

■■■ Console and Curcio argue that the district court in the second trial erred by admitting the Accident Book under the business record exception to the hearsay rule. Fed.R.Evid. 803(6).[11] This exception for "Records of Regularly Conducted Activity" authorizes the admission of:

[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The appellants argue that the Accident Book was inadmissible hearsay because the government did not produce a witness "qualified" to give the foundation testimony required by Rule 803(6) and thus failed to introduce the foundation evidence required for the admission of the Accident Book as a business record. Console Br. at 18–27; Curcio Br. at 34–39, 43. They also argue that even if the Accident Book qualified as a business record, it was inadmissible under Rule 803(6) because "the method or circumstances of [its] preparation indicate lack of trustworthiness." *Id.* at 27–31. We exercise plenary review over the district court's interpretation of the Federal Rules of Evidence, but review a ruling based on a permissible interpretation of a rule for abuse of discretion. *United States v. Furst,* 886 F.2d 558, 571 (3d Cir.1989) (citing *In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238, 265 (1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). *See also Petruzzi's IGA v. Darling–Delaware Co.,* 998 F.2d 1224, 1237 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

■■■ Rule 803(6) does not require the foundation evidence for the admission of a business record to be provided by the record's custodian. Instead, the rule authorizes

62 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)).

**11.** They also argue that the Accident Book was not authenticated properly. Console Br. at 18 n.

13. However, based on the testimony given by Campbell and several other witnesses, we disagree.

parties to elicit the evidence from any "other qualified witness." Fed.R.Evid. 803(6). We have recognized that the term "other qualified witness" should be construed broadly, and that a qualified witness " 'need not be an employee of the [record-keeping] entity so long as he understands the system.' " *Pellulo*, 964 F.2d at 201 (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6)[02], at 803–178). Thus, a qualified witness only need "have familiarity with the record-keeping system" and the ability to attest to the foundational requirements of Rule 803(6). *Id.* at 201–02. The foundation requirements to which a qualified witness must attest are:

(1) [that] the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.

*Furst*, 886 F.2d at 571 (citing Rule 803(6)).

■ The district court did not abuse its discretion by admitting the Accident Book and the summary chart derived from it. Sharon Campbell, the witness through whom the Accident Book was introduced into evidence, was a "qualified witness." Markoff employed her for seven years as a file clerk, a therapist, a receptionist, and a clerk in the "legal department." Govt.App. at 971–72. Her testimony indicates that through her work, she became familiar with the office record-keeping system and the various forms and documents regularly kept by the office. Govt.App. at 972–80, 990–95; Console App. at 237–53, 272–75, 306–12. Campbell's familiarity with the office record-keeping system enabled her to attest to each of the four foundation requirements for the admission of the Accident Book as a business record.

Campbell testified that her mother, who also was a Markoff employee, first created the book in 1980 to organize the "legal department" by providing a record of certain key dates including: the date of the patient's accident; the date of the patient's first visit to Markoff's office; and the dates on which the legal department sent certain documents to the patient's attorney. Console App. at 238–44; 306–08. Campbell also testified that the office receptionist generally entered the date of a patient's first visit when the patient came in or at the end of the receptionist's shift. She then identified the Accident Book entries that she had made and those that her mother had made. *Id.* at 245–47. Finally, Campbell testified that while she was employed in the "legal department" of the Markoff practice, she relied on the Accident Book and inserted information in the book when "something was overlooked." *Id.* at 249–53, 310–12. Based on this experience, she concluded that the Accident Book was "85 to 95 percent" accurate. *Id.* at 310.

Campbell's testimony satisfied the foundation requirements of Rule 803(6) because it "demonstrate[d] that the records [in the Accident Book] were made contemporaneously with the act the documents purport[ed] to record by someone with knowledge of the subject matter, that they were made in the regular course of business, and that such records were regularly kept by the business." *Pelullo*, 964 F.2d at 201. The government also called three other employees of the Markoff office who had made entries in the Accident Book, and their testimony regarding the book corroborated Campbell's. Console App. at 324–33, 349–55, 369–75. Furthermore, although the evidence indicates that the Accident Book was not completely accurate, the circumstances of its production indicate that it was sufficiently reliable to constitute a business record.

■ Finally, the appellants' argument that the Accident Book was inadmissible under Rule 803(6) because the employees who made entries in the Accident Book and in other business records used to fill in omissions in the Accident Book relied on information provided by patients lacks merit. Rule 803(6) does not require that the person transmitting the recorded information "be under a business duty to provide accurate information." *United States v. Patrick*, 959 F.2d 991, 1001 (D.C.Cir.1992). Instead, "it is sufficient if it is shown that … [the] standard practice was to verify the information provid-

ed," *id.*,[12] or that the information transmitted met the requirements of another hearsay exception, Fed.R.Evid. 805. *See* Michael H. Graham, Federal Practice and Procedure: Federal Rules of Evidence § 6757, at 643 (1992).

▮ In this case, there was testimony indicating that the existing file of someone who was not a new patient was retrieved and forwarded to Markoff, and no new medical history chart was prepared. Console App. at 327, 373. This procedure indicates that when the receptionist did not have personal knowledge of whether a patient's visit was his or her first, there was a process for ascertaining this information. Moreover, a patient's statement that he or she is visiting a doctor for the first time satisfies the requirements of another hearsay exception, Rule 803(4), which provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history" are not excluded by the hearsay rule. *See Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271–72 (5th Cir.1991). During oral argument, Console argued at length that the information obtained from the patients for the Accident Book was only significant for billing purposes, and thus was in itself hearsay, which in view of Fed.R.Evid. 805 was inadmissible. The record indicates, however, that the information taken from the patient for the Accident Book was given to Markoff for use when he saw the patient. Console App. at 324–25. Indeed, at the trial Console did not even cite Fed.R.Evid. 805 to object to the Accident Book on the ground that it contained "[h]earsay included within hearsay" so that the included hearsay itself was required to conform to an exception to the hearsay rule. Rather, his objection was general.[13] Overall we are satisfied that the circumstances of the Accident Book's creation and the source of its contents, *i.e.*, patients and business records created based on the personal knowledge of Markoff's employees and patients, provide sufficient indicia of trustworthiness to satisfy the business record exception.[14]

The appellants analogize this case to *Pelullo* and *Furst*, Console Br. at 19–21, Curcio Br. at 35–36, 38–39, two cases in which we held that the foundation requirements of Rule 803(6) had not been satisfied. But this case is distinguishable from *Pelullo* because in *Pelullo* the government sought to introduce bank-generated records of wire transfers through an FBI agent who "did not purport to have familiarity with the record-keeping system of the banks, nor ... attest to any of the other requirements of Rule 803(6)." *Pelullo*, 964 F.2d at 201–02. *Furst* is also distinguishable because in *Furst* "neither witness called by the government [to lay a foundation for the purported business records] had any knowledge as to the accuracy of the information on which the ... documents were based or as to the knowledge of the persons who prepared the records," *Furst*, 886 F.2d at 572, and "the government did not call a single employee to explain the origin of the data reflected in the documents," *id.* at 572 n. 18. Consequently it cannot be contended successfully on the basis of either *Pelullo* or *Furst* that the district court abused its discretion in the admission of the Accident Book and the summary chart based on it.[15]

### E. ADMISSION OF OTHER INSTANCES OF FRAUD

▮ Console and Curcio argue that the admission of prejudicial evidence of prior "bad acts" in violation of Fed.R.Evid. 404(b)

---

**12.** *See also United States v. Zapata*, 871 F.2d 616, 625 (7th Cir.1989); *United States v. Lieberman*, 637 F.2d 95, 100–01 (2d Cir.1980).

**13.** Even on appeal Console did not cite Rule 805 in his brief.

**14.** Console also argues that the district court's admission of the Accident Book violated the Confrontation Clause of the Constitution. Console Br. at 29–31. This argument lacks merit inasmuch as the Accident Book qualified as a business record under Rule 803(6), a well-established exception to the hearsay rule. *White v. Illinois*, — U.S. —, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992).

**15.** "Summaries of voluminous business records are admissible in evidence where the records are already in evidence, permitting independent verification of the summaries." *Meister v. Commissioner of Internal Revenue*, 504 F.2d 505, 513 (3d Cir.1974) (citations omitted), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).

taints their convictions.[16] First, they challenge the admission of firm files containing allegedly inflated bills submitted to the firm by doctors other than Markoff. Console Br. at 34. Four guidelines set forth by the Supreme Court govern the admission of prior "bad acts":

> (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted.

*United States v. Sampson,* 980 F.2d 883, 886 (3d Cir.1992) (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988)). Rule 404(b) provides that:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We review the district court's decision to admit evidence of prior "bad acts" for abuse of discretion. *Sampson,* 980 F.2d at 986 (citing *United States v. Traitz,* 871 F.2d 368, 389 (3d Cir.1989), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989)).

 Console and Curcio argue that the files containing bills submitted by other doctors were not introduced for a proper purpose under Rule 404(b) and were irrelevant under Rule 402. We, however, disagree. Although the prosecutor may not have clearly "articulate[d] a way in which the tendered evidence logically tend[ed] to establish or refute a material fact in issue," the court did. It held that the files were admissible under Rule 404(b) as evidence of knowledge, intent, plan, scheme, and design. Govt.App. at 525–31; Console App. at 489–532. Rule 404(b) "is inclusive, not exclusive," *Sampson,* 980 F.2d at 886, and Console's argument that knowledge and intent were not at issue in

this case lacks merit. Console's and Curcio's knowledge of the fraudulent bills submitted to them by Markoff and their intent to defraud the insurance companies to whom they submitted these claims were central issues in this case. Evidence that Console and Curcio received and submitted fraudulent bills from other doctors tended to support the finding that Console and Curcio knew Markoff's bills were fraudulent and that they intentionally submitted them to insurance companies as part of a broader plan to defraud insurance companies through fraudulent personal injury claims. Moreover, the files satisfy the requirements of Rules 402 and 403. There was ample evidence to connect them to Console and Curcio, and their probative value was not "substantially outweighed" by the danger of unfair prejudice to the defendants. *See Petruzzi's IGA,* 998 F.2d at 1237.

 Appellants also argue that the district court erred in admitting the testimony of Michael Keeler, one of the firm's former personal injury clients, who testified that Console, Curcio, and the doctor to whom they referred him helped him to submit an inflated insurance claim. This evidence was admissible under Rule 404(b) on the same basis as the files containing inflated bills from doctors other than Markoff, and satisfied the requirements of Rules 402 and 403. Moreover, although appellants argue that Keeler's testimony regarding statements made by the doctor to whom he was referred are inadmissible hearsay, we conclude that they are admissible statements by a coconspirator. *See United States v. Gambino,* 926 F.2d 1355, 1360–62 (3d Cir.) (citing Rule 801(d)(2)(E); *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)), *cert. denied,* — U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). Console and Curcio contend that the hearsay statements themselves were the sole evidence of a conspiracy among Console, Curcio, and the doctor to whom they referred Keeler. Keeler's testimony regarding statements made by Console and Curcio prior to Keeler's appointment with the doctor, and the inflated medical bill submitted by the doctor, however, provide ample independent evi-

---

**16.** Curcio argues this point by joining in Console's brief on the issue.

dence of the existence of a conspiracy among the appellants and Keeler's doctor. Govt. App. at 602–52. Thus, without reaching the issue of whether the doctor's hearsay statements alone could establish the existence of a conspiracy, *Gambino,* 926 F.2d at 1361, we conclude that the district court did not abuse its discretion by admitting Keeler's testimony regarding the doctor's statements.

## F. GOVERNMENT'S CROSS–EXAMINATION OF CONSOLE REGARDING HIS CONTEMPT HEARING

■ Prior to the first trial, New Jersey Superior Court Judge E. Stevenson Fluharty held Console in contempt for failing to comply with a court order requiring the firm to deposit $16,000 a month in a fund created for his former law partner, LiVolsi, subsequent to LiVolsi's departure from the firm. At both the first and second trials, the prosecutor cross-examined Console regarding this incident. At the second trial, Console objected to the prosecutor's reading of excerpts from the transcript of the contempt hearing out of context, and, in response to this objection, the court ordered the prosecutor to read all of Judge Fluharty's findings. Console App. at 690–702. Judge Fluharty's findings included statements indicating that Console was in charge of the firm's policies and daily operations and that his testimony was not credible. On the basis of these statements, Console argues that Judge Fluharty's findings were inadmissible under Rules 404(b) and 608(b), and that the district court abused its discretion by permitting the cross-examination regarding the contempt hearing and ordering the prosecutor to read all of Judge Fluharty's findings. Console Br. at 54.

Console's position lacks merit because he "invited" any error which occurred in the use of Judge Fluharty's opinion. Although Console objected to any cross-examination regarding the contempt proceeding at his first trial, at his second trial Console actually caused the extensive use of the evidence of the proceeding. Without seeking to introduce Judge Fluharty's opinion into evidence, the prosecutor began using excerpts from the opinion to cross-examine Console. Only after Console objected to the prosecutor's reading of selected portions of the transcript did the district court order the prosecutor to read all of Judge Fluharty's findings. Moreover, although the prosecutor never introduced the transcript of the contempt hearing into evidence, Console chose to do so on redirect. "Thus, if there was any error at all, it was 'invited error' and cannot now be a basis for reversal." *Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d 767, 772 (3d Cir.1975). "A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby." *United States v. Lewis,* 524 F.2d 991, 992 (5th Cir.1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976).

## G. HEINTZ'S TESTIMONY REGARDING A PHONE CONVERSATION WITH CURCIO

■ Curcio argues that the district court in the second trial erred in admitting the testimony of Markoff's employee, Kimberly Heintz, regarding her telephone conversation with Curcio. Heintz testified that after she sent a report to Curcio regarding one of his clients, a man who identified himself as Curcio called her. Govt.App. at 138–41; Curcio App. at 86–88. According to Heintz, this man stated that he had received the report she sent and "requested a bill to go along with the report on his client for treatment from a period of May 1983 through September of 1984 or into September of 1984." Govt.App. at 139. When Heintz retrieved the patient's billing card, she found records of only a few treatments in May 1983. *Id.* However, Markoff instructed her to prepare a bill for treatment covering the entire period. *Id.* at 140.

Curcio argues that the district court erred in admitting Heintz's testimony regarding the phone conversation because Heintz was not competent to testify on this matter. Curcio Br. at 40 (citing Fed.R.Evid. 104). However, as the government points out, Curcio's actual complaint is that testimony regarding the phone conversation was inadmissible because the requirements of Fed. R.Evid. 901 were not satisfied. Govt.Br. at 33. Rule 901(a) provides that in order to be

admissible, evidence must be authenticated or identified "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Thus, based on Rule 901, Heintz's testimony regarding the content of her phone conversation was inadmissible, unless there was sufficient evidence to support a finding that the phone conversation was in fact a phone conversation between Heintz and Curcio.

"[I]t is well settled that telephone calls may be authenticated by circumstantial evidence as well as by direct recognition of the person calling." *United States v. Alper,* 449 F.2d 1223, 1229 (3d Cir.1971) (citing *United States v. Frank,* 290 F.2d 195 (3d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961)), cert. denied, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972).[17]

> 'The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent. The scope of appellate review upon this issue is confined to determining whether the admission constituted abuse of judicial discretion in determining that a prima facie case had been made out.'

*United States v. Addonizio,* 451 F.2d 49, 72 (3d Cir.) (quoting *Carbo v. United States,* 314 F.2d 718, 743 (9th Cir.1963)), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). We conclude that the district court did not abuse its discretion by admitting Heintz's testimony regarding the phone conversation.[18] As stated in the Advisory Committee Notes on Rule 901, "a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." Fed.R.Evid. 901 advisory committee note ex. (4). In this case, the content of the conversation combined with the caller's self-identification sufficiently supported a finding that Curcio was the caller.

## H. EXCLUSION OF EXTRINSIC EVIDENCE TO IMPEACH GOVERNMENT WITNESS

■ Markoff argues that the district court in the first trial erred by excluding testimony of his employee Kathy Daley on the basis of Fed.R.Evid. 608(b). Markoff Br. at 47. Markoff represented to the district court that Kathy Daley would testify that his billing secretary, Marie Maugeri, gave Daley false medical receipts so that Daley could submit a false insurance claim. Govt.App. 1017–23. In earlier testimony, Maugeri had denied falsifying her own insurance claims. Id. at 1021. The district court ruled that Daley's proposed testimony was barred by Rule 608(b) because it was extrinsic evidence which Markoff sought to introduce to impeach Maugeri's credibility. Id. at 1021–22.

Rule 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime ... may not be proved by extrinsic evidence." But as the government concedes, "evidence barred by Rule 608(b) solely for impeachment can be admitted if it is otherwise relevant to a material issue." Govt.Br. at 65. For example, in *United States v. Anderson,* 859 F.2d 1171, 1178 (3d Cir.1988), we noted that extrinsic evidence may be introduced as evidence of a witness's bias or interest in the case.[19] Markoff sought to

---

17. *See also United States v. Addonizio,* 451 F.2d 49, 71 (3d Cir.) ("It is clear that the connection between a message (either oral or written) and its source may be established by circumstantial evidence.") (citing VII Wigmore on Evidence § 2155(1)(b); *United States v. Alper,* 449 F.2d 1223, 1229 (3d Cir.1971)), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

18. The government argues the standard of review should be plain error because "the defendant has not established that he raised the authentication issue in the district court, rather than a more general Rule 402 relevancy objec-

tion." Govt.Br. at 36 n. 28. We do not decide whether the plain error standard is appropriate, inasmuch as the district court did not err in its ruling.

19. *See also United States v. Martz,* 964 F.2d 787, 789 (8th Cir.) ("While documents may be admissible on cross-examination to prove a material fact, ... or bias, ... they are not admissible under Rule 608(b) merely to show a witness' general character for truthfulness or untruthfulness.") (citations omitted), cert. denied, ––– U.S. –––––, 113 S.Ct. 823, 121 L.Ed.2d 694 (1992); *United States v. Cardenas,* 895 F.2d 1338, 1345

introduce Daley's testimony to rebut testimony indicating that Markoff was aware of the Law Firm–Markoff Enterprise and *knowingly* agreed to participate in the conduct of its affairs through a pattern of racketeering. Although Daley's testimony did not involve a fraud charged in the indictment, it may have been probative of Markoff's knowledge of the fraudulent billing practices of his employees. Thus, arguably the district court abused its discretion by using Rule 608(b) to exclude testimony that was relevant to a material issue in the case, Markoff's knowledge.[20] Nonetheless, we need not reach this issue because even if the district court erred in its decision, in the context of this case, the error on this minor point was harmless due to the compelling evidence supporting Markoff's RICO convictions. In this regard we observe that evidence that *someone else* also may have submitted a false insurance claim, if germane at all, would have had, at most, tangential significance at this trial in view of the volume of evidence implicating Markoff.

## I. REFUSAL TO PROVIDE SPECIAL VERDICT FORM AT FIRST TRIAL

■ Console argues that the district court's denial of his request for a special

verdict form at his first trial resulted in a violation of his Fifth Amendment double jeopardy and due process rights. Console was charged with over 40 predicate acts of mail fraud but the indictment only charged 11 "separately as substantive mail fraud offenses." Console Br. at 55–56.[21] Console requested that the court give the jury a special verdict form, allowing it to render a "verdict" on each of the more than 40 predicate acts. Inasmuch as the district court denied this request, the jury did not render a specific "verdict" on any of the predicate acts not charged separately as mail fraud offenses. Although the jury had the opportunity to "acquit" the appellants of predicate acts charged separately as mail fraud offenses, the jury could not "acquit" them of the predicate acts not charged as separate offenses.[22] Thus, Console argues that by denying his request for a special verdict form and allowing him to be retried for the predicate acts on which the jury was not permitted to render a verdict at his first trial, the district court violated his Fifth Amendment double jeopardy and due process rights.

■ Console's position lacks merit. The double jeopardy clause of the Fifth Amendment provides that no person shall "be sub-

(11th Cir.1990) (" 'Rule 608(b) should not stand as a bar to the admission of evidence introduced to contradict, and which the jury might find disproves, a witness's testimony as to a material issue in the case.' ") (quoting *United States v. Opager*, 589 F.2d 799, 803 (5th Cir.1979)); *Lamborn v. Dittmer*, 873 F.2d 522, 528 (2d Cir.1989) (Rule 608(b) "is inapplicable in determining the admissibility of evidence introduced to impeach a witness's testimony as to a material issue.") (citations omitted); *United States v. Opager*, 589 F.2d 799, 802 (5th Cir.1979) ("We consider Rule 608(b) to be inapplicable in determining the admissibility of relevant evidence introduced to contradict a witness's testimony as to a material issue.") (citing McCormick, Evidence § 47 (2d ed. 1972); 3A Wigmore, Evidence §§ 1000–1005 (Chadbourne rev. 1970)).

20. The government also argues that even if the evidence were admissible under Rule 608(b), it would be inadmissible because it is hearsay not fitting within any of the hearsay exceptions. We need not reach this issue.

21. Most of the predicate acts of mail fraud charged against Console could not be charged as

separate mail fraud offenses because they were time-barred. Console Br. at 56. Moreover, ten of the predicate acts of mail fraud were not charged as separate mail fraud offenses against any of the defendants. *Id.* at 56 n. 43. Curcio has adopted Console's argument with regard to these ten predicate acts. Curcio Br. at 43. Thus, we dispose of Console's and Curcio's claims together on the same basis. We point out, however, that Curcio may not have requested the special verdict form, in which event he may not have preserved this point for appeal. In view of our disposition of Console's contentions on this point, we need not examine further the question of whether Curcio may advance this contention on the appeal.

22. After the first trial, the government dismissed predicate act charges that corresponded to separate mail fraud charges on which individual defendants had been acquitted at the first trial. Console Br. at 57. The district court declared a mistrial on the RICO and mail fraud counts which had not been resolved. *Id.* at 57 n. 44 (citing Tr. 1/32–33; A. 726–28). Console moved to dismiss the charges prior to the second trial on double jeopardy grounds, but the court denied his motion. *Id.*

ject for the same offense to be twice put in jeopardy of life or limb." The clause

> affords a defendant three basic protections: [It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

*Ohio v. Johnson,* 467 U.S. 493, 498, 104 S.Ct. 2536, 2540, 81 L.Ed.2d 425 (1984) (quoting *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)) (citation and internal quotation marks omitted). *See United States v. Dixon,* —— U.S. ——, 113 S.Ct. 2849, 2855, 125 L.Ed.2d 556 (1993). None of these protections precluded Console's retrial on the RICO counts because he was not acquitted or convicted on them at the first trial, and he therefore also was not punished for the RICO offenses charged in the counts. "[A] retrial following a 'hung jury' does not violate the Double Jeopardy Clause." *Richardson v. United States,* 468 U.S. 317, 324, 104 S.Ct. 3081, 3085, 82 L.Ed.2d 242 (1984) (citing *Logan v. United States,* 144 U.S. 263, 297–98, 12 S.Ct. 617, 627–28, 36 L.Ed. 429 (1892)).

> It has been established for 160 years, since the opinion of Justice Story in *United States v. Perez,* 22 U.S. 579, 9 Wheat. 579, 6 L.Ed. 165 (1824), that a failure of the jury to agree on a verdict was an instance of 'manifest necessity' which permitted a trial judge to terminate the first trial and

retry the defendant, because the ends of justice would otherwise be defeated.

*Id.* 468 U.S. at 323–24, 104 S.Ct. at 3085.

 Console argues that the "district court's unjustified refusal to allow the first jury to separately consider each predicate act . . . deprived him of . . . the right to have one's case decided by the first jury empaneled." Console Br. at 63 (citing *United States v. Jorn,* 400 U.S. 470, 474, 91 S.Ct. 547, 551–52, 27 L.Ed.2d 543 (1971)). However, a defendant has no right to a verdict on the elements of an offense. *United States v. Riccobene,* 709 F.2d at 228.

 The district court has discretion in determining whether to submit special interrogatories to the jury regarding the elements of an offense. *Riccobene,* 709 F.2d at 228.[23] "[E]ven where the opposing party does not object, the court is not required to submit special questions to the jury." *Id.* There is no evidence that the court abused its discretion in denying Console's request, as the jury already was faced with the difficult task of resolving multiple RICO and mail fraud counts against multiple defendants. Markoff App. at 67–72. Moreover, even when special interrogatories regarding RICO predicates are submitted to the jury, the court is permitted to give an instruction to the jury to answer the interrogatories only after it votes to convict, thereby alleviating the danger of prejudice to the defendant.[24]

In this case, the district court submitted to the jury a special interrogatory listing the predicates within the statute of limitations because for a RICO conviction the govern-

---

**23.** *See also United States v. Ogando,* 968 F.2d 146, 149 (2d Cir.1992) (citations omitted) ("we commit the decision of whether and how to utilize special interrogatories . . . [in complex criminal cases] to the broad discretion of the district court"); *Note, Bifurcated Jury Deliberations in Criminal RICO Trials,* 57 Fordham L.Rev. 745, 754 (1989) (citations omitted) ("The ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge. . . . Neither the prosecutor nor the defendant has the right to insist on their use."). We are not concerned with whether a jury could be instructed to answer special interrogatories before determining whether to convict or acquit as that procedure was not used here. *See Pungitore,* 910 F.2d at 1136 n. 74.

**24.** *See, e.g., Riccobene,* 709 F.2d at 228 n. 19 (emphasis added) ("in the present case the questions were to have been submitted *after* the verdict had been returned and the jury polled. Thus, the dangers usually involved in the use of jury interrogatories in a criminal case were not present here."); *Note, Bifurcated Jury Deliberations in Criminal RICO Trials,* 57 Fordham L.Rev. 745, 753–54 (1989) (citing *United States v. Ruggiero,* 726 F.2d 913, 925, 927 n. 3 (2d Cir.) (Newman, J., concurring in part, dissenting in part), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984)). As we indicated in footnote 23, *supra,* we are not faced here with a situation in which the court instructed the jury to answer interrogatories before it voted to convict.

ment had to prove at least one predicate within the statute of limitations. Govt.App. at 935–36. But the court instructed the jury to specify which of the racketeering acts it found to constitute a pattern of racketeering only if it found Console guilty of a RICO count. *Id.* at 932–33. Thus, even if this special interrogatory had listed the time-barred predicates in addition to those that were not time-barred, the jury at the first trial would not have reached a decision on these predicates because it did not find Console guilty of a RICO count.

■ Finally, even if the district court had submitted the requested special interrogatories to the jury and the jury had indicated that certain predicate acts had not been established, Console's reprosecution under RICO based on these predicate acts would not have violated his double jeopardy rights. The double jeopardy clause protects against relitigation of an issue necessarily determined in the defendant's favor by a valid and final judgment. *Ashe v. Swenson,* 397 U.S. 436, 442–45, 90 S.Ct. 1189, 1193–94, 25 L.Ed.2d 469 (1970). In *Ashe,* 397 U.S. at 442, 90 S.Ct. at 1193–94, the Supreme Court held that in criminal cases, collateral estoppel "is part of the Fifth Amendment's guarantee against double jeopardy." *Ashe* involved a defendant who was prosecuted for the robbery of one member of a poker game, acquitted, and subsequently prosecuted for the robbery of another member of the poker game. *Id.* at 438–39, 90 S.Ct. at 1191–92. "The single rationally conceivable issue in dispute before the jury [at the first trial] was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not." *Id.* at 445, 90 S.Ct. at 1195. Therefore, the Court concluded that even though

the second prosecution involved a different "offense," it violated the double jeopardy clause. *Id.* at 445–47, 90 S.Ct. at 1195–96. Accordingly, *Ashe* applies when the government "has *lost* an earlier prosecution involving the same facts." *United States v. Dixon,* —— U.S. at ——, 113 S.Ct. at 2860 (emphasis in original).

■ Console argues that the "district court's unjustified refusal to allow the first jury to separately consider each predicate act ... prevented Console from reaping any benefit from the doctrine of collateral estoppel." Console Br. at 63. We disagree. Although the principles of estoppel may apply to the retrial of a "hung" count, *United States v. Bailin,* 977 F.2d 270, 277 (7th Cir. 1992),[25] they apply only when "an issue of ultimate fact has ... been determined [in defendant's favor] by a valid and final judgment." *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194.[26] For example, in *United States v. Bailin,* the Court of Appeals for the Seventh Circuit held that "[i]n a retrial of a mistried count in a multicount indictment, ... direct estoppel bar[s] the government from relitigating issues that were *necessarily* and *finally* decided in the defendant's favor by reason of the jury's partial acquittal on other counts." *Bailin,* 977 F.2d at 276 (emphasis added). Thus, the court affirmed the district court's ruling that the government was precluded from proving "acquitted counts as predicate acts for substantive RICO violations." *Id.* at 283. But inasmuch as a response to a special interrogatory regarding an element of a "hung" count is neither a "final" judgment nor a determination "necessary" to a final judgment,[27] such a response would not preclude the government from re-

---

**25.** The court in *United States v. Bailin,* 977 F.2d 270, 277 (7th Cir.1992), held that although the principles of "collateral estoppel" do not apply to the reprosecution of a "hung" count because the reprosecution is a " 'continuation' of the first trial," and thus is not collateral, principles of direct estoppel do apply.

**26.** In the criminal context, principles of estoppel or issue preclusion do not preclude "relitigation" of an issue decided in the government's favor. Thus, a conviction of a racketeering offense does not preclude a subsequent prosecution for a RICO violation based on this racketeering of-

fense, *United States v. Grayson,* 795 F.2d 278, 283 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), because Congress intended to authorize separate convictions and cumulative punishments for predicate and RICO offenses and because these offenses are not the "same" offense for double jeopardy purposes. *Id.*

**27.** *See Riccobene,* 709 F.2d at 232 ("The predicate offenses referred to in the [RICO] statute are not themselves the RICO violation, they are merely one element of the crime.").

litigating an issue.[28] Thus, even if the jury at the first trial had indicated that the predicate offenses on which the RICO counts rested had not been established, Console would have reaped no benefit from the doctrine of collateral estoppel and the government would have been free to reprosecute the RICO counts based on these predicate offenses.

## J. JUROR TAINT AT FIRST TRIAL

### 1. Denial of motion for a new trial

 Markoff argues that extra-record information introduced into the jury's deliberations by Juror # 11 requires the reversal of his RICO convictions. According to Markoff, during deliberations Juror # 11 advised the jury that she had discussed the definition of RICO with her sister-in-law who is an attorney, and that her sister-in-law had indicated that "[c]onviction for two predicate acts *must result* in conviction for RICO." Markoff Br. at 22 (emphasis in brief). Although the district court found that Juror # 11 did communicate her sister-in-law's opinion to four jurors, it concluded that Juror # 11's comment

was not prejudicial and therefore denied Markoff's motion to set aside his convictions. *United States v. Markoff,* Crim. No. 89–148, at 18 (D.N.J. May 1, 1992).

"A motion for a new trial is addressed to the trial judge's discretion, and the scope of review is whether such discretion was abused." *Government of the Virgin Islands v. Lima,* 774 F.2d 1245, 1250 (3d Cir.1985) (citing *United States v. Adams,* 759 F.2d at 1108; *United States v. Bujese,* 371 F.2d 120, 124–25 (3d Cir.1967)); *accord United States v. Gilsenan,* 949 F.2d 90, 95 (3d Cir.1991) (citing *Government of the Virgin Islands v. Lima,* 774 F.2d at 1250)), *cert. denied,* —— U.S. ——, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992). In this case, the district court did not abuse its discretion in denying Markoff's motion for a new trial.

The district court held that Juror # 11's comment created a presumption of prejudice to the defendant, but that the government rebutted that presumption. *United States v. Markoff,* Crim. No. 89–148, at 10. The government maintains that the district court

28. As the Court in *Ashe* stated, "[w]here a previous judgment of acquittal was based upon a general verdict, as is usually the case," a court must

'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'

*Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194 (citations omitted). Thus, "the collateral estoppel component of the Double Jeopardy Clause" does not exclude evidence "simply because it relates to alleged criminal conduct for which a defendant has been acquitted." *Dowling v. United States,* 493 U.S. 342, 348, 110 S.Ct. 668, 672, 107 L.Ed.2d 708 (1990). The defendant bears the burden of demonstrating "that his acquittal in his first trial represented a jury determination" of an "ultimate issue" in the second trial. *Id.* at 349, 110 S.Ct. at 673.

We seem not to have considered *Ashe*'s applicability to a RICO case. Generally, however, it would be very difficult for a defendant to demonstrate that a RICO acquittal precluded subsequent prosecution for the underlying predicate offenses or vice versa. *See Bailin,* 977 F.2d at 282 ("When a case involves a general verdict, establishing that the verdict necessarily determined any particular issue is extremely difficult."). *See also United States v. Esposito,* 912

F.2d 60 (3d Cir.1990) (prosecution of predicate offenses subsequent to a RICO acquittal did not violate double jeopardy), *cert. dismissed,* 498 U.S. 1075, 111 S.Ct. 806, 112 L.Ed.2d 1032 (1991); *United States v. Esposito,* 968 F.2d 300, 302 (3d Cir.1992) ("[B]ecause the jury found Esposito not guilty of the overall RICO charge, the jury did not answer any special interrogatories as to whether he had committed the specific predicate acts charged against him"); *Pungitore,* 910 F.2d at 1107 n. 21 (RICO prosecution based in part on a predicate act previously charged as an overt act in a continuing criminal enterprise indictment which had resulted in an acquittal did not violate double jeopardy protections. "[T]he double jeopardy clause does not preclude the government from relying on the same evidence to prove successively charged offenses. It only operates as a bar to proof of the same conduct and then, only in certain circumstances.") (citing *Grady v. Corbin,* 495 U.S. 508, 519, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990)).

Moreover, principles of estoppel do not require the verdict rendered at a single trial to be consistent. As we concluded in *United States v. Vastola,* 899 F.2d 211, 225 (3d Cir.1990) (citing *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)), *cert. granted and judgment vacated on other grounds,* 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990), where a jury acquits a defendant of all but one predicate offense but convicts of a RICO offense, the inconsistent verdict is not reversible automatically.

erred in applying a presumption of prejudice to the comment. Govt.Br. at 70 n. 68 (citing *Gilsenan,* 949 F.2d at 95 n. 7). The district court based its determination that Juror # 11's comment was presumptively prejudicial on *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (*Remmer I* ) and *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (*Remmer II* ). The *Remmer* cases involved a possible attempt to bribe a juror and an FBI interview conducted with this juror to investigate the incident. The Court in *Remmer II* held that a presumption of prejudice "attaches to the[se] kind[s] of facts." *Remmer II,* 350 U.S. at 380, 76 S.Ct. at 427. As the Court explained,

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court ... with full knowledge of the parties.

*Id.* at 379, 76 S.Ct. at 426–27 (quoting *Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451).

The district court correctly concluded that the Supreme Court in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), did not reject *Remmer's* presumption of prejudice. *See Stockton v. Virginia,* 852 F.2d 740, 744 (4th Cir.), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989); *United States v. Butler,* 822 F.2d 1191, 1195 n. 2 (D.C.Cir.1987). *Cf. United States v. Boylan,* 898 F.2d 230, 261 (1st Cir.) ("the *Remmer* standard should be limited to cases of significant *ex parte* contacts with sitting jurors or those involving aggravated circumstances far beyond ... [the exposure to media coverage] shown here"), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).

*Phillips* involved a juror who applied for a position in the district attorney's office during a trial. Although the district attorney's office did not respond to the application during the trial, the defendant claimed that the

juror's conduct required the court to impute bias to the juror. The *Phillips* Court held that absent proof of actual bias, the juror's relationship with the government did not require a new trial. *Phillips,* 455 U.S. at 220, 102 S.Ct. at 948. However, *Phillips* is distinguishable from this case and the *Remmer* cases because *Phillips* did not involve a third-party communication with a juror regarding "the matter pending before the jury." *Remmer II,* 350 U.S. at 379, 76 S.Ct. at 426 (citing *Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451).

The government cites *Gilsenan* for the proposition that the district court's application of a presumption of prejudice was inappropriate. Govt.Br. at 70 n. 68 (citing *Gilsenan,* 949 F.2d at 95 n. 7). *Gilsenan,* however, is also inapposite because it did not involve direct communication between a juror and a third party during deliberations. Instead, *Gilsenan* involved jurors exposed to allegedly prejudicial media coverage at the outset of a trial. *Gilsenan,* 949 F.2d at 95–96. Thus, although the circumstances in *Gilsenan* were not "close to being sufficiently aggravated to give rise to a presumption of prejudice," *id.* at 95 n. 7 (citing *United States v. D'Andrea,* 495 F.2d 1170, 1172–73 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974)), the circumstances in this case, like those in *Remmer,* do give rise to a presumption of prejudice.[29]

▬▬▬ In considering whether the government rebutted the presumption of prejudice, we make our "determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." *Gilsenan,* 949 F.2d at 95 (citing *United States v. Boylan,* 898 F.2d at 262). " '[N]ot every exposure to extra-record information about the case will require a new trial.' " *Gilsenan,* 949 F.2d at 97 (quoting *Government of the Virgin Islands v. Dowling,* 814 F.2d 134, 139 (3d Cir.1987)). Moreover, allegations of juror exposure to prejudicial extra-record information do not automatically require the court to conduct an eviden-

---

**29.** Two of our recent cases declining to apply the presumption of prejudice are also distinguishable because they did not involve third-party contact with a juror. *United States v. Resko,* 3 F.3d 684, 695 (3d Cir.1993); *Waldorf v. Shuta,* 3 F.3d 705, 710 n. 6 (3d Cir.1993).

tiary hearing. *Id.* (citing *United States v. Boscia,* 573 F.2d 827, 831 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978); *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989)). "[T]he trial judge has discretion ... to decide how to deal with a situation in which there is an allegation of jury misconduct ... [and] [t]his discretion extends to the determination of whether prejudice has been demonstrated." *United States v. Resko,* 3 F.3d 684, 690 (3d Cir.1993) (citing *Dowling,* 814 F.2d at 137–38; *United States v. Clapps,* 732 F.2d 1148, 1152 (3d Cir.1984), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Pantone,* 609 F.2d 675, 679 (3d Cir.1979)).

There are two reasons why the district court did not abuse its discretion in denying Markoff's motion for a new trial based on Juror # 11's comment. First, the district court conducted an individual *in camera* voir dire of each juror and on the basis of the voir dire concluded that Markoff had not been prejudiced. During the voir dire, the court asked each juror specific questions regarding: (1) the nature of Juror # 11's comments about her sister-in-law, and (2) the identities of the jurors to whom Juror # 11 made these comments. *See* Markoff App. at 81–120; Supp.Govt.App. at 24–163. This method of inquiry is the one we have preferred "[w]here there is a significant possibility that a juror or potential juror has been exposed to prejudicial extra-record information." *Dowling,* 814 F.2d at 137.

. As a result of the district court's thorough inquiry, this case is distinguishable from *United States v. Resko,* 3 F.3d 684 (3d Cir. 1993), and other cases in this circuit where the district court's failure "to evaluate the nature of the jury misconduct or the existence of prejudice" required a new trial. *See Resko,* 3 F.3d at 694 (holding that in light of "unequivocal proof of jury misconduct discovered mid-trial," jurors' responses to questionnaire asking whether they had engaged in premature deliberations and, if so, whether the discussions had led them to form an opinion regarding the defendants' guilt or innocence were inadequate basis for evaluation of juror taint); *Waldorf v. Shuta,* 3 F.3d 705, 712 (3d Cir.1993) (in light of the nature of the publicity, court's inquiry was inadequate because court failed to ask voir dire questions "designed to elicit answers which provide an objective basis for the court's evaluation," and failed to voir dire three of eight jurors individually); *Dowling,* 814 F.2d at 137, 141 (court's exclusive reliance on in banc questioning of jurors did not provide court with sufficient basis for assessing jury's exposure to extra-record information); *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356, 1357 (3d Cir.1975) ("Because the trial court did not conduct a *voir dire,* and because we cannot speculate what the jurors' responses would have been to an appropriate inquiry, we conclude that the appellee must be afforded a new trial.") (emphasis in original).

We have deferred to district court evaluations of juror misconduct in cases where the court conducted individualized voir dire examinations. In *United States v. Pantone,* 609 F.2d at 679, a case involving jurors alleged to have formed premature opinions, we affirmed the trial court's denial of defendants' motion for a mistrial in part based on "the promptness and care with which the trial judge conducted the [individual voir dire examinations]." Similarly, in *United States v. Clapps,* 732 F.2d at 1152 (citation omitted), a case involving premature jury deliberations, we held that the trial court did not abuse its discretion in denying a motion for a new trial because "the [district] court conducted a corrective voir dire and was 'convinced that there was no prejudicial juror misconduct and ... that defendants received a fair trial.'"

Finally, in *Resko,* where the district court relied on the jurors' responses to a questionnaire, we stated that: (1) we upheld the district court determinations of "non-prejudice" in *Pantone* and *Clapps* "out of deference to the district court's superior ability to assess the situation and to evaluate the jurors' impartiality because it had questioned them individually," and that (2) if the district court in *Resko* had "conducted some additional inquiry to ascertain whether the jurors were influenced by their premature deliberations, this most likely would have sufficed to

support any determination it made about the absence of prejudice against the defendants." *Resko,* 3 F.3d at 692 (dicta) (citing *Pantone,* 609 F.2d at 679; *Clapps,* 732 F.2d at 1152). Although extra-jury influences "pose a far more serious threat to the defendant's right to be tried by an impartial jury," than intra-jury communications, *Resko,* 3 F.3d at 690 (citations omitted), the reasoning in these three cases is equally applicable to cases involving extra-jury influences.

The second reason that the district court did not abuse its discretion in denying Markoff's motion for a new trial based on Juror # 11's comment is that the circumstances of the case support the district court's conclusion that Juror # 11's comment was harmless. In *Pantone,* we reviewed "the entire *voir dire,*" and concluded that the "impact" of the juror misconduct was "rather inconsequential." *Pantone,* 609 F.2d at 679.[30] Review of the voir dire in this case leads us to the same conclusion. Juror # 11 admitted to having made a comment regarding a discussion with her sister-in-law, but stated that the conversation involved the definition of conspiracy, not the relationship between RICO and predicate acts of mail fraud. *United States v. Markoff,* Crim. No. 89–148, at 13–14 (Markoff App. at 92–101). As the district court stated, Juror # 11's comment that conspiracy includes "the turning of a deaf ear on something" is incorrect. *United States v. Markoff,* Crim. No. 89–148, at 14. Nonetheless, the district court's finding that this comment did not taint the jury verdict is not in error because the comment was followed by an instruction on the law and none of the other jurors recalled the comment. *Id.*[31]

Furthermore, six of the 12 jurors had no recollection of Juror # 11 commenting on the opinion of a relative who was an attorney. *United States v. Markoff,* Crim. No. 89–148, at 11–12.[32] One juror only recalled Juror # 11 saying that her sister-in-law thought RICO cases were "hard cases." *Id.* at 12. The four jurors who recalled that Juror # 11 said something about the relationship between RICO and predicate acts of mail fraud could not remember the exact nature of the comment. Markoff App. at 85–91, 105–06, 111–12, 118. Finally, the district court indicated the juror who "had the best recollection of the events in question," "characterized ... [Juror # 11's] statements in the jury room as ... 'a one line type of thing ... [that] wasn't delved into,'" *United States v. Markoff,* Crim. No. 89–148, at 12 (Markoff App. at 103), and another juror stated that Juror # 11 "definitely" did not use her comment to try to "persuade other jurors to change their mind." Markoff App. at 113.

Finally, the timing of the jury's exposure to Juror # 11's comment supports the district court's conclusion that the comment was not prejudicial. In *Gilsenan,* we held that where jurors are exposed to allegedly prejudicial information at the outset of a trial, it is inconceivable "that the allegedly prejudicial information could have had an impact on the verdict." *Gilsenan,* 949 F.2d at 96. Similarly, in *Waldorf* we found it "significant" that the jury was exposed to the damages award in a case involving similar injuries "both the night before and the very same day that it reached a verdict." *Waldorf,* 3 F.3d at 713. Although Juror # 11's comment occurred during deliberations, the record supports the district court's statement that following Juror # 11's comment, it instructed the jury on

30. *See also United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.) (" 'The touchstone of decision ... [is] the nature of what has been infiltrated and the probability of prejudice.' The trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.") (citation omitted), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

31. "As we have explained, '[t]he trial court is obviously in a better position (than the appellate court) to observe the impact of ... [juror miscon-

duct], and to make a considered judgment as to the effectiveness of a cautionary instruction.' " *Resko,* 3 F.3d at 690 (quoting *Pantone,* 609 F.2d at 679).

32. The district court stated that seven of the 12 jurors had no recollection of Juror # 11's comment, but one of these seven contacted the district court judge following the voir dire and told him that she recalled Juror # 11 saying " 'something about RICO' and that her sister-in-law said 'these were hard cases.' " *United States v. Markoff,* Crim. No. 89–148, at 12.

the relationship between RICO and predicate acts of mail fraud, and that the "the jury deliberated for an additional two days" following Juror # 11's comment. *United States v. Markoff*, Crim. No. 89–148, at 15–16 (Markoff App. at 104). Moreover, the jury rendered two partial verdicts before convicting Markoff on the RICO counts. Markoff App. at 23–24. Because the district court conducted individual voir dire examinations, and the results of these examinations support its conclusion that Juror # 11's comment was harmless, the district court did not abuse its discretion by denying defendant Markoff's motion for a new trial.[33]

2. *Denial of request for second jury inquiry*

■ Markoff also argues that the district court's failure to conduct a second jury inquiry to investigate Juror # 11's allegation that other jurors read newspaper accounts of the case during the trial requires that we reverse his convictions. But as we noted above, "the trial judge has discretion ... to decide how to deal with a situation in which there is an allegation of jury misconduct ... [and] [t]his discretion extends to the determination of whether prejudice has been demonstrated." *Resko*, 3 F.3d at 690 (citing *Dowling*, 814 F.2d at 137–38; *United States v. Clapps*, 732 F.2d at 1152; *United States v. Pantone*, 609 F.2d at 679). *See also United States v. Thornton*, 1 F.3d 149, 155 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993). In the circumstances here, the district court did not abuse its

discretion by denying Markoff's request for a second jury inquiry.

■ "If there is reason to believe that jurors have been exposed to prejudicial information, the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial. There is no obligation for the judge to conduct an investigation, however, where no foundation has been established." *United States v. Vento*, 533 F.2d 838, 869–70 (3d Cir.1976) (citations omitted).[34] In this case, the district court found that Juror # 11's allegation that other jurors were reading newspaper accounts of the case was not credible. *United States v. Markoff*, Crim. No. 89–148, at 20. We defer to its finding because the district court had the opportunity to observe Juror # 11's demeanor when she made the allegation and because the circumstances of Juror # 11's allegation are not inconsistent with the court's finding. Thus, the district court was not required to conduct a second jury inquiry because it had no "reason to believe that the jurors ha[d] been exposed to prejudicial information."[35]

Furthermore, our holding in *Gilsenan* indicates that even if Juror # 11's allegation was credible, the district court did not abuse its discretion by failing to conduct a second jury inquiry. In *Gilsenan*, we held that because "the district court assumed that the appellants could substantiate their allegations that the jury was exposed to [prejudicial newspaper accounts of the case,] ... a hearing was

**33.** Console argues that because he was not allowed to participate in the post-trial proceedings involving juror taint, his conviction should be reversed and the case should be remanded with instructions to dismiss the RICO counts of the indictment. The district court, however, correctly denied Console's request to participate in the juror taint hearing. Inasmuch as Console was not convicted in the first trial, and thus obtained a new trial, any juror misconduct that occurred in the first trial could not possibly have prejudiced him.

**34.** *See also United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983) ("a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence") (citations omitted), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

**35.** This case is distinguishable from *Waldorf* where we held that the district court's voir dire was insufficient "to ascertain whether there was a substantial likelihood of actual prejudice" due to juror exposure to media coverage of a damage award in a case involving similar injuries. *Waldorf*, 3 F.3d at 711. In that case, the district court questioned five of the eight jurors and learned that four of them had been exposed to the media coverage on the night before and the day of the damage verdict, and that a prejudicial newspaper article had been physically present in the jury room just prior to deliberations. *Id.* at 711–13. Accordingly, unlike the district court in this case, the district court in *Waldorf* had "reason to believe that jurors ha[d] been exposed to prejudicial information," and therefore was "obliged to investigate the effect of that exposure on the outcome of the trial." *United States v. Vento*, 533 F.2d at 869 (citations omitted).

not needed to develop the facts and the court did not abuse its discretion in not holding one." *Gilsenan,* 949 F.2d at 97. As we explained,

> [t]he purpose of a hearing is to determine what happened, that is to establish the historical record. Accordingly, a hearing need not be held at the behest of a party whose allegations if established would not entitle it to relief.

*Id.* (citing *Government of the Virgin Islands v. Forte,* 865 F.2d at 62).[36]

■ Thus, inasmuch as the district court assumed that prior to their deliberations, the jurors were exposed to the articles brought to the court's attention by Markoff,[37] and concluded that such exposure "would not rise to the level of substantial prejudice," *United States v. Markoff,* Crim. No. 89–148, at 22, the district court was not required to conduct a second jury inquiry.[38] As we have recognized,

> [j]urors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here. It is a qualitatively different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose.... 'It is not at all clear ... that the jury system could survive such efforts to perfect it.'

*Gilsenan,* 949 F.2d at 98 (quoting *Tanner v. United States,* 483 U.S. 107, 120, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987)).

## K. PROSECUTORIAL MISCONDUCT BEFORE THE GRAND JURY

Markoff argues that the district court erred in denying his pretrial motion to dismiss the indictment due to prosecutorial misconduct before the grand jury. Markoff Br. at 30–44.[39] We conclude that even if the district court erred in denying the motion, the guilty verdict entered against Markoff in the first trial rendered this error harmless.

It seems that the evidence in this case was presented to four separate grand juries. The first grand jury was empaneled on June 21, 1984. Markoff App. at 171 n. 1 (*United States v. LiVolsi,* Crim. No. 89–148, at 3 n. 1 (D.N.J. Apr. 11, 1990)). The first indictment, however, was not returned until April 19, 1989. This indictment was returned by the third grand jury against Curcio and Markoff and four codefendants: Philip LiVolsi, Peter Hulmes, Virginia Knowlton, and Carmela Lombardi. Govt.Br. at 4. The third grand jury then filed two superseding indictments, one on February 8, 1990, and one on February 15, 1990. Markoff App. at 170; *United States v. LiVolsi,* Crim. No. 89–148, at 2; Govt.Br. at 4. The third grand jury's term expired on February 17, 1990. A fourth superseding indictment was filed on August 23, 1990, however, by a fourth grand jury,

**36.** *See also Waldorf,* 3 F.3d at 709–10 (citing *United States v. Jackson,* 649 F.2d 967, 976 (3d Cir.) (citation omitted) ("we upheld a three-step procedure adopted by the district court to determine whether publicity during the course of trial had prejudiced the jury. First, a court determines whether the news coverage is prejudicial. Second, *if it is,* the court determines whether any jurors were exposed to the coverage. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality.") (emphasis added), *cert. denied,* 454 U.S. 871, 102 S.Ct. 341, 70 L.Ed.2d 176 (1981)).

**37.** In his brief, Markoff faults the court for failing to address a number of allegedly prejudicial articles about the case which appeared during deliberations. The district court, however, properly limited its inquiry to the one article about the case that appeared prior to deliberations, since Juror # 11 alleged that jurors were reading newspaper accounts about the case "prior to

going to deliberation." *United States v. Markoff,* Crim. No. 89–148, at 19–20. The district court also considered a series of articles dealing with insurance fraud which appeared in the *Star Ledger,* a New Jersey newspaper, prior to deliberations and were brought to the court's attention during the trial. *Id.*

**38.** The newspaper articles to which the jury may have been exposed were not "sufficiently aggravated to give rise to a presumption of prejudice" to Markoff. *Waldorf,* 3 F.3d at 710 n. 6 (citing *United States v. D'Andrea,* 495 F.2d 1170, 1172 n. 5 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974)).

**39.** Curcio has also adopted Markoff's argument. Curcio Br. at 43. We reject Curcio's position on the same grounds that we reject Markoff's position inasmuch as Curcio, like Markoff, subsequently was convicted of offenses charged in the indictment.

empaneled on January 18, 1989. Govt.Br. at 76.

The alleged prosecutorial misconduct occurred during the questioning of Carmella Lombardi on August 6, 1986, and June 24, 1987, and the questioning of Virginia Knowlton on June 24, 1987.[40] Therefore, we must conclude, although the briefs do not specify, that the alleged misconduct actually occurred before the second grand jury which heard evidence on this case.[41] Markoff and Curcio moved to dismiss the last of three indictments returned by the third grand jury based on the prosecutor's alleged misconduct. Inasmuch as the alleged prosecutorial misconduct occurred before the third grand jury had been empaneled, the third grand jury must have been exposed to the alleged misconduct, if at all, through transcripts of the proceedings before the second grand jury.[42] The briefs, however, are ambiguous on this score.

The district court denied the appellants' motion to dismiss the indictment because it concluded that "[t]he infractions relied upon by the defendants to demonstrate prejudice did not and could not have altered the juror's [sic] independent consideration of this evidence." Markoff App. at 185; *United States v. LiVolsi*, Crim. No. 89–148, at 17. Markoff now appeals this ruling, arguing that although each individual incident of misconduct

may have been harmless, their cumulative effect was prejudicial. Markoff Br. at 38. He also argues that the trial court erred in denying his motion to dismiss the indictment because "the prosecutor's colloquy for approximately 10% of the testifying witnesses before the Grand Jury" was lost. *Id.* at 39. Although there is no evidence indicating that the transcripts were lost intentionally, Markoff argues that given the pattern of alleged misconduct that appears in the available transcripts, the court could not conclude that the missing 10% would not have "tipped the scale in the defendant's favor." Thus it should have dismissed the indictment. *Id.* at 40.

The government argues persuasively that the issue of prosecutorial misconduct is not properly before this court. The government bases this argument on the fact that after the denial of Markoff's motion to dismiss the last indictment returned by the third grand jury, a fourth grand jury returned the fourth and final superseding indictment in this case. Govt.Br. at 76. There is no record of a motion to dismiss this fourth and final indictment on the grounds of prosecutorial misconduct before the grand jury which returned it.

■ Although the briefs do not so specify, it may be that the fourth grand jury was exposed to transcripts of the proceedings before the second grand jury, and thus ex-

---

**40.** The district court found that the prosecutor asked improper questions which implied that the defendants were guilty and assumed the existence of ultimate facts within the grand jury's sole discretion. *United States v. LiVolsi*, Crim. No. 89–148, at 9–10; Markoff App. at 177–78. The court also found that the prosecutor engaged in "numerous examples of impermissible testifying, badgering and commenting on the veracity of witnesses and evidence," but concluded that the prosecutor's conduct was harmless.

The court also concluded that the lost colloques did not affect its ability to assess the prejudice because even if they revealed additional offensive conduct, the indictment was supported by strong independent evidence. *United States v. LiVolsi*, Crim. No. 89–148, at 24.

The district court rejected the argument that the prosecutor violated Lombardi's Sixth Amendment right to counsel by denying her initial requests to consult an attorney, inasmuch as the right to counsel does not attach until a defendant has been charged. *Id.* at 12. The district court also rejected the argument that the prosecutor

violated Lombardi's Fifth Amendment privilege against self-incrimination by denying her initial requests to consult with an attorney and Knowlton's Fifth Amendment privilege by continuing to question her after she had invoked the privilege and implying that her decision to invoke her Fifth Amendment right might lead to her indictment. *Id.* at 13–15. The court based this determination on the fact that neither Lombardi nor Knowlton actually gave any incriminating testimony.

**41.** It seems that the term of the first grand jury would have expired by August 1986, and that the third grand jury was not empaneled until 1988.

**42.** In its opinion denying the motion to dismiss the indictment, the district court stated that inasmuch as the colloquy during Lombardi's testimony never was transcribed, and "[t]he indicting grand jury was read a transcript of Lombardi's testimony," it never was "exposed to any irregular conduct which may or may not have occurred." *United States v. LiVolsi*, Crim. No. 89–148, at 23.

posed to the alleged prosecutorial misconduct which occurred in 1986 and 1987. Even assuming this occurred, however, the petit jury's guilty verdict rendered any prosecutorial misconduct before the indicting grand jury harmless. *United States v. Mechanik*, 475 U.S. 66, 70–72, 106 S.Ct. 938, 941–43, 89 L.Ed.2d 50 (1986). Any prosecutorial misconduct before the grand jury

> had the theoretical potential to affect the grand jury's determination whether to indict these particular defendants for the offenses with which they were charged. But the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70, 106 S.Ct. at 941–42. Like *Mechanik*, this case is distinguishable from *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), because *Vasquez* involved the "pernicious" problem of racial discrimination in the selection of grand jurors. *Mechanik*, 475 U.S. at 70 n. 1, 106 S.Ct. at 942 n. 1 (citing *Vasquez*, 474 U.S. at 260–62, 106 S.Ct. at 622–23). In *Vasquez*, the Supreme Court held that racial discrimination in the selection of the grand jury demanded the automatic reversal of a subsequent conviction because reversal "was necessary as a prophylactic means of deterring grand jury discrimination in the future." *Mechanik*, 475 U.S. at 70 n. 1, 106 S.Ct. at 942 n. 1 (citing *Vasquez*, 474 U.S. at 262, 106 S.Ct. at 623).[43] However, "these considerations have little

force outside the context of racial discrimination in the composition of the grand jury." *Mechanik*, 475 U.S. at 70 n. 1, 106 S.Ct. at 942 n. 1. Although there is a substantial social interest in deterring prosecutorial misconduct before the grand jury, "it does not rise to the level of the interest in deterring racial discrimination." *Id.* (citations omitted). Moreover, the alleged prosecutorial misconduct before the grand jury did not rise to the level of a constitutional violation. Thus, the societal interest in avoiding the expense of a second trial far outweighs the appellants' interest in having a new trial based solely on prosecutorial misconduct before the grand jury. As the Supreme Court stated in *Mechanik*, the

> societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.

*Id.* at 72, 106 S.Ct. at 943.

Markoff also argues that prosecutorial misconduct during his trial violated his Sixth Amendment right to a fair trial. Markoff Br. at 44–46. The conduct challenged by Markoff includes: (1) the prosecutor's failure to provide witness statements to defense counsel, Markoff App. at 139–140, (2) repeated references to matters not in evidence some of which Markoff alleges were inadmissible under Rules 404(b) and 403, *id.* at 141–143, 152–157, and (3) the statement "Let him take the stand" made by the prosecutor as part of an objection to a question regarding what the witness had heard defendant Curcio say, *id.* at 144.[44]

---

43. *See also Ramseur v. Beyer*, 983 F.2d 1215, 1225 (3d Cir.1992) ("The Court has ruled that a determination of racial discrimination in the selection of grand jurors will support the quashing of a resulting indictment and reversal of the conviction.") (citing *Rose v. Mitchell*, 443 U.S. 545, 556, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979)), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). *But see Ramseur*, 983 F.2d at 1239–42 (concurring opinion).

44. Markoff also refers to a *"Giglio* violation" by the prosecutor. Markoff Br. at 44 (citing *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31

L.Ed.2d 104 (1972); Markoff App. at 138). However, his brief is not specific enough for us to identify the exact nature of the alleged misconduct. In *Giglio*, the Court held that the prosecutor's failure to disclose a promise not to prosecute the government's chief witness required a new trial. *Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766. The most we can discern from Markoff's appendix is that the prosecutor allegedly withheld evidence of some auto accidents. "[A] passing reference to an issue in a brief will not suffice to bring that issue before this court on appeal." *Simmons v. City of Philadelphia*, 947 F.2d 1042,

■ In evaluating whether the prosecutor's misconduct rose to the level of constitutional violation, we must examine that conduct in the context of the trial as a whole.

*Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir.1992) (citing *Greer v. Miller*, 483 U.S. 756, 766, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987)), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). We conclude that although the prosecutor's conduct may have been questionable at times, any misconduct was harmless in the context of the trial as a whole.[45] This is particularly true due to the curative instructions given to the jury by the district court. *See, e.g.*, Markoff App. at 151 (following "Let him take the stand" comment); 141–143, 159 (following references to matters not in evidence); *see Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1178 (3d Cir.1993).

## L. RESTITUTION AWARD

■ Console argues that the district court erred in awarding restitution to the victims of his crimes without making specific findings regarding the actual losses they incurred.[46] According to the presentence report prepared by the probation department, Console owed $167,332 in restitution to the victims of his frauds. This figure is the sum of the amounts paid by insurance companies for claims associated with the predicate RICO acts proven and the mail fraud counts for which Console was convicted. Console argues that the court's sentence of restitution violates the standards for determining restitution awards pursuant to the Victim Witness Protection Act (VWPA), 18 U.S.C. §§ 3579–80, Console Br. at 69,[47] because the court simply adopted the figure recommended in the presentence report without making any findings of fact. He also argues that the restitution award is erroneous because it exceeds the amount of loss suffered by the victims. According to Console, the court was required to engage in a claim-by-claim analysis of the amount each of the victimized insurance companies would have paid for each claim absent fraud. Console Br. at 68–69. In determining whether an award is authorized by law, we exercise plenary review, but we review the amount of a particular award for abuse of discretion. *United States v. Furst*, 918 F.2d 400, 408 (3rd Cir. 1990) (citing *United States v. Pollak*, 844 F.2d 145, 152 (3d Cir.1988); *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985)).

■ In *United States v. Palma*, 760 F.2d at 480 (citing *United States v. Novak*, 715 F.2d 810, 820 (3d Cir.1981), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984)), we "invoke[d] our supervisory power to require district courts in the future to make specific factual findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA." Pursuant to this decision,

> we have required factual findings concerning (1) the amount of loss sustained by the victims, ... (2) the defendant's ability to make restitution, ... and (3) 'how the amount of ... restitution imposed ... relate[s] to any loss caused by the conduct underlying the ... offenses for which [defendant] remain[s] convicted.'

*United States v. Logar*, 975 F.2d 958, 961 (3d Cir.1992) (quoting *Furst*, 918 F.2d at 410, and citing *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir.1987), and *United States v. Pollak*, 844 F.2d at 155–56). Console contends that the district court failed to make a factual finding as to the loss sustained and the relationship between the loss

---

1066 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992) (citations omitted). *See also Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 446–47 (3d Cir.1992).

**45.** The prosecutor made a comment on Curcio's failure to take the stand but it was "harmless beyond a reasonable doubt;" and thus would not entitle him to a new trial under any circumstances. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Moreover, since the comment was made at Curcio's first trial, which produced a hung jury, Curcio did, in fact, get a new trial.

**46.** Markoff adopts Console's arguments on this point with respect to his restitution obligations. Curcio was not ordered to pay restitution. Curcio App. at 2.

**47.** The parties cite to these sections apparently because the offenses were committed prior to the sections being redesignated at 18 U.S.C. §§ 3663–64, effective November 1, 1987.

and the amount of restitution awarded. We conclude, however, that the district court made a factual finding as to the loss sustained and its relation to the restitution award by adopting the presentence report and specifying the dollar value of the loss associated with each count. *See, e.g.*, Console App. at 744–45. Such a record will not be sufficient in every instance, but, in this case, due to the specificity of the presentence report regarding the loss associated with each count for which the defendant was convicted, the record is adequate.

We also point out that at the time of the sentencing, Console's attorney originally suggested that there should be a hearing on the amount of the restitution. However, when the court pointed out that there were perhaps 40 or 50 cases involved, Console's attorney abandoned the idea of a hearing stating, "I'm not suggesting you have 50 hearings." Console App. at 733. Thus, he abandoned his request for the claim-by-claim analysis he now seeks.

Moreover, we also conclude that the restitution award was not excessive. First, it covered only the losses associated with offenses for which Console had been convicted. Thus, it is consistent with the Supreme Court's holding that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Hughey v. United States,* 495 U.S. 411, 420, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990). Second, the district court did not abuse its discretion by estimating the amount of loss associated with each fraudulent insurance claim to be the total amount paid on that claim. At Console's sentencing hearing, the court found that the amount of restitution imposed related to the loss incurred because the restitution equaled the amount paid by insurance companies in connection with fraudulent insurance claims for which he was responsible. Console App. at 732. Although some portion of these claims payments may have covered legitimate injuries and medical expenses, distinguishing the legitimate portion from the portion associated with the fraudulent bills submitted would have been very difficult, if not impossible, even if the court had conducted

the hearing that Console eschewed. Congress

considered the unusual situation where the exact amount owed would be difficult to determine and authorized the court 'to reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim.'

*United States v. Seligsohn,* 981 F.2d 1418, 1421 (3d Cir.1992) (quoting *United States v. Hand,* 863 F.2d 1100, 1104 (3d Cir.1988)). Thus, the district court's restitution award is consistent with the VWPA and does not constitute an abuse of discretion.

### III. CONCLUSION

The judgments of conviction and sentence will be affirmed.